MALONE, Chief Justice.
Auto Owners Insurance, Inc. (“Auto Owners”), appeals the denial by the Baldwin Circuit Court of its motion to dismiss or, in the alternative, to compel arbitration in an action against it filed by Blackmon Insurance Agency, Inc. (“Blackmon”). We reverse and remand.

Facts and Procedural History

The parties agree that in 1995 Black-mon, an Alabama insurance agency, and Auto Owners, an insurance company incorporated in Michigan, entered into an “agency agreement” authorizing Blackmon to act as an agent for the sale of Auto Owners’ insurance in Alabama (“the 1995 agreement”). The 1995 agreement, among other things, authorized Blackmon “to solicit and secure applications and to bind coverage, subject to [Auto Owners’] rules and regulations, for the classes of insurance for which a commission is specified in the attached state commission schedule(s).... ” The 1995 agreement also provided that the commission schedule or schedules could be modified from time to time and that “[Auto Owners] may from time to time prescribe rules and regulations respecting the conduct of business covered hereby....”
The 1995 agreement included an arbitration provision. That provision stated, in pertinent part:
“In the event of any dispute arising out of this Contract, the parties agree to submit such dispute to arbitration as follows[:]
“(a) There shall be three arbitrators^] one shall be selected by [Blackmon], one shall be selected by [Auto Owners], and a third shall be selected by the two arbitrators. If the two arbitrators cannot agree on the selection of a third, a Judge of Circuit Court for Eaton County, Michigan or the County of [Blackmon’s] residence, shall be requested to appoint such third arbitrator.
“(b) The arbitration shall be conducted in accordance with the procedure of the American Arbitration Association. [Blackmon] and [Auto Owners] shall pay the cost of their arbitrator and share equally in the expense of the third arbitrator.”
(Emphasis added.)
The status of another document in the record, ostensibly executed in 2005, is hotly contested. That document is entitled “Letter of Instructions” and is subtitled “Agent’s Agreement Concerning Limitations on the Use of Power of Attorney” (“the 2005 document”). Blackmon alleges that the 2005 document is a stand-alone agreement, independent of the 1995 agreement. Auto Owners, on the other hand, alleges that the 2005 document constitutes “rules and regulations ‘respecting the conduct of business,’ ” as contemplated by and therefore incorporated into the 1995 agreement. The 2005 document contains instructions governing the issuance of a vari *1195 ety of bonds by an agency of Auto Owners, including construction-performance bonds. A copy of the 2005 document is included in the record, but Blackmon insists the signature denoting its assent is either forged or unauthorized. Also in the record is a 2007 commission schedule that lists the types of bonds discussed in the 2005 document among the insurance classifications for which a commission is specified. The 2005 document does not contain an arbitration provision and does not expressly refer to or incorporate any agency agreement.
Auto Owners also alleges, and Blackmon disputes, that the parties entered into a third agency agreement in 2009 (“the 2009 agreement”). Blackmon insists that its signature on the 2009 agreement is also either forged or unauthorized. The 2009 agreement contains an arbitration provision that is substantially identical to the arbitration provision in the 1995 agency agreement, except that the 2009 agreement provides that venue for any arbitration will be in Eaton County, Michigan.
On December 22, 2010, Blackmon filed a complaint in the circuit court seeking a declaratory judgment as to the arbitrability of a dispute between Blackmon and Auto Owners as to which Auto Owners had already initiated arbitration proceedings. In its complaint, Blackmon alleged that Auto Owners had initiated the arbitration proceedings against Blackmon in Eaton County, Michigan. Blackmon also alleged that in the Michigan arbitration proceeding Auto Owners bases its claims on the 2005 document and 2009 agreement.
On January 21, 2011, Auto Owners filed in the Baldwin Circuit Court a motion to dismiss Blackmon’s declaratory-judgment action or, in the alternative, to compel arbitration. It argued that the arbitration proceedings it had initiated in Michigan involved only disputes that were arbitrable under the 1995 agreement and that the circuit court did not have subject-matter jurisdiction to adjudicate Blackmon’s declaratory-judgment action.
On January 24, 2011, the circuit court scheduled Auto Owners’ motion for a hearing on February 15, 2011. On February 14, Blackmon filed its brief in opposition to Auto Owners’ motion. After the hearing, the circuit court, on February 17, 2011, denied Auto Owners’ motion. On March 16, without having filed a motion seeking reconsideration of the circuit court’s ruling, Auto Owners filed a response to Blackmon’s February 14, 2011, brief, which the circuit court apparently treated as a motion to alter or amend its ruling. On March 31, 2011, after another hearing held the same day, the circuit court entered an amended order reaffirming its order of February 17 denying Auto Owners’ motion. Auto Owners filed its notice of appeal with this Court on March 31, 2011.[1]

Standard of Review

This Court’s standard of review of a ruling on a motion to compel arbitration is well settled. Bowen v. Security Pest Control, Inc., 879 So.2d 1139, 1141 (Ala.2003). A direct appeal is the proper procedure by which to seek review of such an order, Rule 4(d), Ala. R.App. P., and this Court reviews the lower court’s order de novo. Bowen, 879 So.2d at 1141. The party seeking to compel arbitration has the initial burden of presenting evidence of the existence of a contract calling for arbitration and of proving that that contract involves interstate commerce. Polaris Sales, Inc. v. Heritage Imports, Inc., 879 So.2d 1129, 1132 (Ala.2003). Once the *1196 moving party meets its initial burden, the party opposing arbitration has the burden of presenting evidence tending to show that the arbitration agreement is invalid or that it does not apply to the dispute in question. Bowen, 879 So.2d at 1141. See also Title Max of Birmingham, Inc. v. Edwards, 973 So.2d 1050, 1052-53 (Ala. 2007).

Discussion

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (“the FAA”), governs this case. Section 2 of the FAA provides, in pertinent part:
“A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.”
Neither party disputes that the 1995 agreement involves interstate commerce.
“The federal policy favoring arbitration is so strong that, as a matter of law, ‘any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.... ’ Ameriquest Mortg. Co. v. Bentley, 851 So.2d 458, 463 (Ala. 2002) (quoting Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). This is so “whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.” Moses H. Cone Mem’l Hasp., 460 U.S. at 25, 103 S.Ct. 927. “[A] motion to compel arbitration should not be denied ‘unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.’” Ex parte Colquitt, 808 So.2d 1018, 1024 (Ala.2001) (quoting United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (I960)).
In keeping with the federal policy in favor of arbitration, this Court has stated further that the question of arbitrability of a given dispute is not answered by “whether the dispute arose from the contract containing the arbitration clause but, rather, whether the dispute arose from the relationship described in the arbitration clause.” Thompson Tractor Co. v. Fair Contracting Co., 757 So.2d 396, 399 (Ala. 2000) (emphasis added). The parties in Thompson Tractor had entered into multiple agreements; some of those agreements contained an arbitration provision and some did not. Fair Contracting Company, Inc., the plaintiff and the party resisting arbitration, alleged that its dispute with Thompson Tractor Company, Inc., arose from agreements that predated any agreements containing the arbitration provision. Noting that the later added arbitration provision specified that disputes arising from “prior negotiations and dealings” between the parties were to be arbitrated, this Court reversed the trial court’s order denying Thompson Tractor’s motion to compel arbitration. Thompson Tractor, 757 So.2d at 399-400.
Likewise, in SouthTrust Securities, Inc. v. McClellan, 730 So.2d 620 (Ala.1999), this Court reversed a trial court’s order denying a motion to compel arbitration. In that case, an employee alleged that his employer had made false pre-employment statements to him during the hiring process that induced him to leave his former employer. The employment agreement contained an arbitration clause, which, by its terms, applied to any dispute “arising out of [the employee’s] employment” with SouthTrust. 730 So.2d at 622. Construing the clause “arising out of ... employment” to include events occurring during *1197 the hiring process, this Court stated: “Such a construction is consistent with the federal courts’ willingness in arbitration eases to look to the type of relationship described in the arbitration clause without limiting it to a contractual relationship.” 730 So.2d at 622 (citing Zink v. Merrill Lynch Pierce Fenner & Smith, Inc., 13 F.3d 330, 333 (10th Cir.1993)).
Blackmon argues that the 2005 document, which does not contain an arbitration provision, is a stand-alone contract that neither incorporates nor is incorporated by the language of the 1995 agreement into the 1995 agreement.[2] To evaluate that assertion we begin with determining the scope of the arbitration provision in the 1995 agreement and conclude with interpreting the 2005 document to determine whether the arbitration provision in the 1995 agreement encompasses the 2005 document.
Nowhere in the record does Blackmon raise any issue with specific regard to the arbitration provision in the 1995 agreement; rather, Blackmon’s arguments focus on the status of the 2005 document and the 2009 agreement as against the 1995 agreement. Moreover, the 1995 agreement, which Blackmon never challenges, expressly incorporates the “procedure of the American Arbitration Association” (“AAA”). The AAA Commercial Arbitration Rules governing the 1995 agreement include Rule R-7(a), which provides: “The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.” (Emphasis added.) Rule R-7(b) of the AAA Commercial Arbitration Rules gives the arbitrator the authority “to determine the existence or validity of a contract of which an arbitration clause forms a part.” Whether any alleged breach by Blackmon under the disputed 2005 document is within the scope of the arbitration provision in the 1995 agreement, and whether the 2005 document and the 2009 agreement are valid, are therefore questions for the arbitrator under the AAA Commercial Arbitration Rules under which Blackmon and Auto Owners agreed to operate in the 1995 agreement. On the basis of pertinent federal authority, this Court has held that “an arbitration provision that incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties’ intent to arbitrate the scope of the arbitration provision.” CitiFinancial Corp. v. Peoples, 973 So.2d 332, 340 (Ala. 2007) (emphasis added).
As to “the relationship described in the arbitration clause,” Thompson Tractor, 757 So.2d at 399, the arbitration provision in the 1995 agreement requires Blackmon and Auto Owners to arbitrate “any dispute arising out of this Contract.” The arbitration provision thus directs the Court’s analysis to the remainder of the contract of which it is a part. The 1995 agreement expressly covers Blackmon’s securing applications and binding coverage for all classes of insurance for which a commission is specified in certain commission schedules incorporated into the agreement and as modified in the future, such as the 2007 commission schedule; it expressly contemplates that Auto Owners would in the future prescribe “rules and regulations *1198 respecting the conduct of business” between the parties to the 1995 agreement and that there would be modifications of the commission schedules. The 2005 document therefore is at least arguably contemplated by and therefore incorporated into the 1995 agreement.
We do not decide whether the 2005 document is encompassed by the arbitration provision in the 1995 agreement, however, because the AAA Commercial Arbitration Rules, which the parties in the 1995 agreement agreed to be bound by, require the arbitrator to decide that question, and “doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.” Moses H. Cone Mem’l Hosp., 460 U.S. at 24-25. We merely note that the various documents at issue in this case underscore that it cannot be said with “positive assurance,” Ex parte Colquitt, 808 So.2d at 1024, that the arbitration provision in the 1995 agreement is not susceptible of an interpretation that would include disputes arising from the 2005 document, nor can it be said at this juncture that the dispute does not arise from the relationship described in the arbitration provision of the 1995 agreement.
In light of the authorities discussed above, the 1995 agreement, and the incorporation of the AAA Commercial Arbitration Rules into that agreement, the task for the circuit court was limited to determining merely whether it was arguable that the 2005 document was encompassed by the 1995 agreement.[3] Because that is an arguable question, it is the arbitrator’s task to decide whether the dispute in this case is, or is not, subject to mandatory arbitration under the 1995 agreement.
Blackmon’s contention before the circuit court that Michigan is not a proper venue is also due to be resolved by arbitration. Rule R-10 of the AAA Commercial Arbitration Rules provides for objections to venue. Thus, all of Blackmon’s contentions in this case must be asserted before the arbitrators pursuant to the description in the arbitration provision of Blackmon’s relationship with Auto Owners. Because the parties agreed in the 1995 agreement to submit all issues of arbitra-bility to arbitration, the circuit court should have responded[4] by granting Auto Owners’ motion to compel arbitration and either issuing a stay of the proceedings pending arbitration or dismissing the case.[5] Because the 1995 agreement, by incorporating the AAA Commercial Arbitration Rules and possibly the 2005 docu-meiit and the 2009 agreement, is disposi-tive of this case, we pretermit discussion of the remaining issues raised by the parties on appeal.

Conclusion

Based on the above discussion and authorities, we conclude that the circuit court erred in denying Auto Owners’ motion to compel arbitration. We therefore reverse that order and remand the case. On remand, the circuit court shall grant the motion to compel arbitration and either *1199 issue a stay of these proceedings pending arbitration or dismiss the case.
REVERSED AND REMANDED WITH INSTRUCTIONS.
STUART, BOLIN, MAIN, and WISE, JJ., concur.
WOODALL and PARKER, JJ., concur in the result.
MURDOCK, J., dissents.
MURDOCK, Justice
(dissenting, as substituted on denial of application for rehearing on June 29, 2012).
The following might be said to be the “first principle” of arbitration law with respect to contracts affecting interstate commerce: “[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration.” First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). See id. at 942 (“the arbitrability of the merits of a dispute depends on whether the parties agreed to arbitrate that dispute”). “Arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.” Id. at 943 (emphasis added).
If the foregoing is the “first principle” of arbitration law, then, unavoidably, principle “1-A” is that a court must decide whether a given issue is in fact one the parties specifically have agreed to arbitrate. “Courts ‘should independently decide whether an arbitration panel has jurisdiction over the merits of any particular dispute.’ ” Id. at 941 (emphasis omitted; quoting with approval Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1509 (3d Cir.1994)). “A disagreement about whether an arbitration clause in a con-cededly binding contract applies to a particular type of controversy is for the court.” Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002).
Under these two principles, when a contract contains an arbitration “clause” consisting of a single provision stating simply that disputes falling within a certain “parameter” — in this case, for example, the parameter of “disputefs] arising out of this Contract” — will be arbitrated, the path to resolution of an underlying dispute is relatively straightforward. A court need only decide whether the underlying dispute falls within the stated parameter and, if it does, refer that underlying dispute to arbitration for decision on its merits.[6]
On the other hand, when a contract contains not only a “first provision” of the nature described above, but also a “second provision” that states that whether an underlying dispute falls within the parameter described in the first provision is, itself, a question to be resolved by the arbitrator rather than by the court, things can get more complicated — much more complicated.
*1200 Justice Breyer, 'writing on behalf of the Court in First Options, noted that a “second provision” of the nature described above is, of course, a contractual agreement itself. Accordingly, reasoned Justice Breyer, “[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agree to arbitrate that dispute [citations omitted], so the question ‘who has the primary power to decide arbitrability’ turns upon what the parties agreed about that matter.” (First emphasis added.) He went on to explain that if “the parties agreefd] to submit the arbitrability question itself to arbitration,” then the arbitrator should decide it. First Options, 514 U.S. at 943.
“If, on the other hand, the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely independently. These two answers flow inexorably from the fact that arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.”
514 U.S. at 943.
It was a relatively easy thing to do in First Options to declare that if, by its terms, a contract contained a “second provision” stating that the parties agreed to submit the arbitrability question itself to arbitration, then the arbitrator should decide the arbitrability question. After all, there was no arbitration clause at all— neither a so-called “first provision” nor a “second provision” — that had been signed by the individuals seeking to avoid arbitration in that case. The Court in First Options did not have to analyze the applicability, or workability, of its newly recognized principle in relation to any particular “second provision”; the need for any such analysis was precluded by the fact that there was no such provision to be analyzed.
The present case, however, does involve a contract (the so-called 1995 agreement) that contains an arbitration clause signed by the party resisting arbitration. It is, of course, a clause with a “first provision,” i.e., a provision that consigns to arbitration the merits of underlying disputes that fall within a certain parameter. As noted, the “first provision” of the clause at issue in this case defines that parameter as “dis-putéis] arising out of this Contract.”
The arbitration clause at issue in this case also contains a “second provision,” i.e., one that purports to delegate to the arbitrator the additional, threshold task of resolving disagreements as to whether an underlying dispute is one that falls within the parameter described in the first provision. The fact that this second provision exists, however, only begs a question that itself must be addressed in the context of the “first principles” identified at the outset of this writing: How do we know that the parties intended this “second provision” to apply to any given disagreement? That is, we have here a disagreement over whether the underlying dispute is one that falls within the parameter prescribed in the “first provision” of the arbitration clause. How do we know whether that disagreement is, itself, one the parties specifically have agreed should be resolved by the arbitrator? To answer that question, we must turn to the specific language of the “second provision” because, as noted above, “the question “who has the primary power to decide arbitrability ” “is simply a matter of contract between the parties” and “turns upon what the parties agreed about that matter.” First Options, 514 U.S. at 943.
*1201 In this ease, the language in question is not explicitly found in the 1995 agreement itself, but is incorporated by a reference to the Commercial Arbitration Rules of the American Arbitration Association (“the AAA”).[7] Specifically, we are called upon to apply the following language from Rule R-7(a) of the AAA Commercial Arbitration Rules: “The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.”
At this point, I pause for a moment to consider how much more “sense” our situation would make if, instead of the above-quoted language from Rule R-7(a), we had before us a “second provision” that contained its own parameter, defining some universe of disputes to which it would apply that was broader than the universe of disputes to which the first provision applies. Consider, for example, the following hypothetical second provision with the emphasized parameter: “As to any dispute arising from any business relationship between the parties, a disagreement as to whether that dispute specifically ‘arises out of this contract’ for purposes of the first provision of this paragraph will, itself, be decided by the arbitrator.” Because this “second provision” would, by its terms, apply to a broader universe of disputes than that to which the “first provision” applies, it logically would allow for separate fields of decision for the court and the arbitrator. That is, the court, consistent with the first principle and principle 1-A, would decide whether a disagreement over who will decide whether the underlying dispute is to be arbitrated is one that arises from some “business relationship” of the parties. If the court decides that this disagreement does relate to a dispute that falls within this broader “business relationship” parameter, then, under the terms of the second provision, the court would send this disagreement to the arbitrator for the arbitrator to resolve. Then, but only then, would it fall to the arbitrator to decide if the underlying dispute is one that falls within the narrower universe of underlying disputes “arising from this Contract.”
Unfortunately, the foregoing is not the type of second provision we have here. Instead, we have here a second provision that sets no parameter on the types of disagreements to which it applies beyond that set in the first provision. As noted, it states only that “[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the ... scope ... of the arbitration agreement.” Thus, I submit, we meet ourselves coming: In order to decide whether such a second provision applies to any particular disagreement, we, as a court, must decide whether that disagreement relates to a dispute arising out of the contract. Once we have decided that, however, there is nothing left for the arbitrator to decide insofar as the second provision is concerned. Paradoxically, a second provision of this nature creates no field of decision for the arbitrator.
*1202 The main opinion in effect circumvents this paradox by adopting a rule of “argua-bility.” Under this approach, if a disagreement pertains to a dispute that is “at least arguably contemplated” by the first provision of the arbitration clause, then the question whether it actually is contemplated by the first provision is to be sent to the arbitrator.
In reference to this newly adopted standard, I first find myself compelled to ask whether we know what is meant by the term “arguable.” Do we really mean “reasonably arguable”? The main opinion provides no definition or standard for what is meant by the term “arguable.” We are dealing here with issues of law in relation to the intended reach of contractual language and what is arguable (or even reasonably arguable) to one judge may be frivolous to another, at least without some further definitional standard to guide judges in their calculation of where this new “arguability” parameter lies. In short, I suggest that “arguability’ is an uncertain and undefined standard and, accordingly, not a workable one.
More fundamentally, however, I question the legal basis for the Court’s adoption today of such a standard. It is of course fundamental that the contractual obligations of the parties are to be a function only of their objective manifestation of assent. See Deeco, Inc. v. 3-M Co., 435 So.2d 1260,1262 (Ala.1983) (“The existence vel non of a contract is determined by reference to the reasonable meaning of the parties’ external and objective manifestations of mutual assent.”). I see no reference to an arguability standard in Rule R-7(a) of the AAA Commercial Arbitration Rules — the “second provision” at issue here. That rule merely provides that the arbitrator will decide whether a given dispute is, or is not, within the arbitrator’s jurisdiction; the power of an arbitrator to decide whether a dispute is, or is not, within the arbitrator’s jurisdiction is not, by the terms of Rule R-7(a), limited to those disputes that are “arguably” within that jurisdiction.
The main opinion cites no precedent, and I have found none, to support the judicial imputation of a limiting standard in an arbitrability clause of this nature. To the contrary, my concern about the validity of judicially imputing such a standard is heightened still further by the fact that our doing so appears to conflict with the fundamental principle that the parties’ agreement to arbitrate the issue of arbitra-bility must be a function of “clear and unmistakable” evidence. First Options, 514 U.S. at 944.[8]
*1203 Without the inclusion within the “second provision” of a parameter defining some different, broader universe of disagreements to which that provision was intended to apply, and especially in light of the principle that agreements relating to the delegation to arbitrators of disagreements over the arbitrability of a dispute must be a function of “clear and unmistakable” evidence, I cannot agree to judicially impute to the “second provision” in this case some limitation on its reach not explicitly agreed to by the parties, especially one as undefined as the “arguability” standard adopted here. Nor can I contemplate that the parties intended for the arbitration clause in the 1995 agreement to apply to any and all future disputes between them, no matter how far removed in subject matter or in time from the contractual arrangements evidenced by the 1995 agreement. Obviously, there is no indication that the parties intended such a far-reaching arrangement, and a question would exist as to the enforceability of any such agreement.
Without the parties’ having agreed to any other universe of disagreements to which the second provision is intended to be applicable, we, as a court, are left with no parameter for its operation other than in respect to “dispute[s] arising out of this Contract.” Thus, in order to decide that the second provision applies in this case, we must decide that the dispute at issue here is one that arises out of the 1995 agreement. Obviously, in answering that question for purposes of deciding the reach of the second provision, we will necessarily be deciding the question at issue in regard to the scope of the first provision. Thus, the second provision in this case is one that has no logical field of operation.
In light of the foregoing, I would remand this case to the trial court for it to decide whether the underlying dispute in this case is one that arises under the 1995 agreement. If the trial court were to conclude that it does, then the proper course would be for the trial court to refer that underlying dispute to arbitration. Otherwise, the underlying dispute would be one for decision on the merits by the trial court itself. Because the main opinion adopts a different approach to the resolution of the matter before us, I respectfully dissent.[9]

. The parties continued filing motions in the circuit court after Auto Owners had filed its notice of appeal. On August 10, 2011, Auto Owners finally filed a motion in the circuit court to stay those proceedings, which the circuit court granted on August 16.

. We need not address Blackmon’s contention that the signatures of its representatives on the 2005 document and the 2009 agreement are forged or unauthorized. Blackmon’s arguments clearly require holding Auto Owners to the terms of the 2005 agreement, the validity of which Auto Owners does not oppose, and Blackmon admits entering into the 1995 agreement, the arbitration provision in which is substantially identical to the arbitration provision in the 2009 agreement.

. The circuit court, as a court of general jurisdiction, has the judicial power to determine questions of its own jurisdiction. Ex parte Board of Educ. of Blount Cnty., 264 Ala. 34, 37-38, 84 So.2d 653, 656 (1956).

. Any ruling regarding arbitrability issued by the circuit court prior to the arbitrator's ruling is prohibited by the FAA, which provides that, when satisfied that it is faced with an issue referable to arbitration, a court "shall stay the trial of the action” until the arbitration has been completed. 9 U.S.C. § 3.

.Cf. CitiFinancial Corp., 973 So.2d at 341 ("On remand, the trial court shall grant the motion to compel arbitration and either issue a stay of these proceedings pending arbitration or dismiss the case.”).

. While affirming the general rule that "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court," the United States Supreme Court in Howsam, 537 U.S. at 84, also recognized that there are certain " ' "procedural” questions which grow out of the dispute and bear on its disposition’ [that] are presumptively not for the judge, but for an arbitrator, to decide.” 537 U.S. at 84 (noting as examples of such "procedural questions” " ‘allegations] of waiver, delay or like defense to arbitrability' ” (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983))). The issue in the present case is not of the "procedural” variety described in Howsam.

. The “second provision” at issue here consists merely of a statement incorporating by reference the procedural rules of the AAA, which, as discussed in the text, contain a rule providing for the arbitrability of the reach of the arbitration clause. The United States Supreme Court has recognized the principle that "the 'question of arbitrability,’ is ‘an issue for judicial determination [ujnless the parties clearly and unmistakably provide otherwise,' " Howsam, 537 U.S. at 83 (emphasis omitted). Cases decided by this Court have accepted the notion that a general incorporation by reference of AAA rules satisfies this standard, see, e.g., CitiFinancial Corp., L.L.C. v. Peoples, 973 So.2d 332, 339 (Ala.2007), and we have not been asked to revisit that notion in this case.

. I also note that this clear-and-unmistakable-evidence standard by which we evaluate agreements to arbitrate the question of arbi-trability is in conflict with the manner in which the main opinion makes use of what it refers to as a “positive assurance” standard. The latter standard is in fact a standard announced by the United States Supreme Court not with respect to the existence and extent of an agreement to arbitrate the question of ar-bitrability (i.e., the reach of so-called “second provisions”), but rather with respect to the fundamental question whether the merits of the underlying dispute, itself, were intended to be resolved by an arbitrator (i.e., the extent of a so-called "first provision”). See Ameri-quest Mortgage Co. v. Bentley, 851 So.2d 458, 463 (Ala.2002) (quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), for the basic proposition that "[t]he federal policy favoring arbitration is so strong that, as a matter of law, ‘any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ...' ”); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (stating in relation to whether the merits of an underlying dispute should be resolved by an arbitrator that a motion to compel arbitration should not be denied “unless it may be said with positive assurance that the arbitration *1203 clause is not susceptible of an interpretation that covers the asserted dispute”). In other words, the “positive assurance” standard is part of the general, liberal policy favoring arbitration of the merits of underlying disputes and, as such, stands in contrast to the standard by which the question of who should decide the arbitrability of an issue should be addressed. As the Supreme Court explained in Howsam:
"Although the Court has also long recognized and enforced a ‘liberal federal policy favoring arbitration agreements,’ ... it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is
'an issue for judicial determination [ujnless the parties clearly and unmistakably provide otherwise.' AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added); First Options, supra, at 944 ....”
Howsam, 537 U.S. at 83 (emphasis omitted; emphasis added).

. For reasons subsumed by the foregoing analysis, I have come to the conclusion that I erred in agreeing to send to arbitration the disagreement over arbitrability addressed in Part II of this Court's opinion in Custom Performance, Inc. v. Dawson, 57 So.3d 90 (Ala.2010). In Custom Performance, my col *1204 leagues and I did not even bother to adopt an “arguability” standard to define and limit the reach of the “second provision" at issue in that case. Even if we had, I cannot think of any definitional parameter for the concept of "arguability” within which the dispute over the helmet at issue in that case would fall. The arbitration clause at issue in Custom Performance was found in, and clearly was directed to disputes arising out of, a contract only for the sale of tires for a motorcycle. The injuries addressed in Part II of that opinion related to the sale of a helmet that was accomplished by way of an entirely separate contract entered into some months following the sale of the tires. The helmet-sale contract related to an entirely separate transaction, contained no arbitration clause of its own (neither the "first provision” nor a "second provision”), and made no reference to the tire-sale contract or its arbitration provisions. Neither did the tire-sale contract contemplate, much less make any reference to, any future helmet-sale contracts.